YOUNG v. GRAND RAPIDS REFRIGERATOR CO.

GRAND RAPIDS REFRIGERATOR CO. v. YOUNG.

(Circuit Court of Appeals, Sixth Circuit. November 3, 1920.)

Nos. 3316–3318.

1. **Patents ⊘328—928,030, claims 1 and 3, for refrigerator latch, held not infringed.**
   The Crampton patent, No. 928,030, claims 1 and 3, for refrigerator latch, an essential part of which was a pair of toggle arms, *held* not infringed by defendant's latch in which the only equivalent for the toggle arms was similar to the construction in the prior art.

2. **Words and phrases—"Toggle."**
   The characteristic of a "toggle" is that it should comprise two arms with their ends pivoted together, permitting lateral motion at the pivotal point and longitudinal motion at one or both ends of the arms, and its usual office is to translate lateral into longitudinal motion.

3. **Patents ⊘328—988,313, claim 5, for refrigerator latch, held not infringed.**
   The Crampton patent, No. 988,313, claim 5, covering an easily assembled joint of toggle arms in a refrigerator latch, *held* not infringed by a latch which did not use the characteristic feature of the claim.

4. **Patents ⊘328—Reissue No. 14,205 for refrigerator latch, held invalid, as not invention of patentee.**
   The claims of the Young reissue patent, No. 14,205, the characteristic feature of which is a thumb lever on a refrigerator latch, adjusted to open the toggle and throw the striker pin out of engagement, *held* invalid, because that feature was the invention of another than the patentee.

5. **Patents ⊘328—Design patent No. 48,958, for refrigerator latch casings, held valid.**
   The Young design patent, No. 48,958 for refrigerator latch casings, *held* valid as the invention of the patentee, who suggested the design in its final form, and supervised the execution thereof with his employés, and not the invention of customers of the patentee, who earlier suggested to the same employé of patentee a design embracing some feature of the patented design.

6. **Patents ⊘320—Statutory penalties for infringement of design held sufficient.**
   Where a design for refrigerator latch casing was infringed only by sale of such casings as a part of defendant's refrigerators, so that the profits from the use of the patented design cannot be ascertained, a decree awarding $250 damages was all that 'could be allowed,, under Act Feb. 4, 1887, § 1 (Comp. St. § 9476), authorizing an award of $250, and in addition thereto the total profits from the sale of the article or articles to which the design has been applied.

7. **Patents ⊘320—Statutory penalty for design infringement does not apply to each sale.**
   The statutory penalty for infringement of design can be allowed only for the whole infringement, not as to separate sales, unless there is some measure of the infringing sales by subordinate units.

⊘For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

Suits by Leonard A. Young against the Grand Rapids Refrigerator Company for infringement of two original and one reissue patents for refrigerator door latch and two design patents for latch casings. There was a decree finding infringement as to the two original latch patents and one design patent, finding the reissue of the patent invalid, and the other design patent not infringed, and the defendant appeals from the findings of validity and infringement and damages, and complainant appeals from the award of damages as insufficient. Decree as to reissued patent affirmed, and other decree reversed for modification.

In Nos. 3316, 3318:

C. R. Stickney, of Detroit, Mich., for appellant Young.

Frank E. Liverance, Jr., of Grand Rapids, Mich. (Luther V. Moulton, of Grand Rapids, Mich., on the brief), for appellee.
In No. 3317:

Frank E. Liverance, Jr., of Grand Rapids, Mich. (Luther V. Moulton, of Grand Rapids, Mich., on the brief), for appellant.

C. R. Stickney, of Detroit, Mich., for appellee.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. Young brought infringement suits against the Refrigerator Company (hereafter called the defendant), based upon patents for a door latch, numbered 928,030, issued July 13, 1909, to Crampton; patent No. 988,313, issued April 4, 1911, to Crampton; reissue patent No. 14,205, issued October 17, 1916, to Young; and design patents, No. 46,305, of August 18, 1914, and No. 48,958, of April 25, 1916, issued to Young, for latch casings. The District Court sustained, and found infringed, claims 1 and 3 of No. 928,030, claim 5 of 988,313, and the single claim of the design patent No. 48,958; assessed plaintiff's damages upon the theory of a reasonable royalty on the mechanical patents and at $250 on the design patent; found the reissued patent invalid, and design patent No. 46,305 not infringed; and entered a final decree for injunction and damages on the three patents. The refrigerator company appeals from the findings of validity and infringements and damages; Young appeals against the award of damages, because insufficient, and against the decree as to the reissued patent.

The defendant manufactures refrigerators, and needed, for the doors thereof, a latch which would hold the doors tightly shut; Young was in control of a company which manufactured such articles under the Crampton patents, and, for a period, defendant bought and paid for latches which were manufactured by the company in alleged compliance with the inventions and design of Crampton and Young. Later defendant made changes in the form of the latch, and made or bought the changed form; these suits challenge its right to do so.

_Fig. 1._

[1] The three mechanical patents all relate to a device by which spring pressure is utilized to hold the door tightly shut when latched, and thus to cause and maintain a fairly air-tight joint between door and casing. The first Crampton patent makes the chief disclosure; the other two being in the nature of improvements. The dominant feature of the device is a spring-operated toggle joint. Its substance is shown by Fig. 1 and claim 1 of No. 928,030, here reproduced.[1] In this drawing, *F* represents a pin parallel with and projecting horizontally beyond the edge of the door. *A' A'* represent curved spring arms rising from a base and fixed vertically to the casing. Jointed in the extremities of these spring arms is a centrally pivoted pair of levers, forming a toggle, and near the central point each of these levers carries a concave jaw. When the door swings shut, the pin on the door —the striker—comes in contact with this pair of jaws, which is in the position shown by the solid lines in the drawing. Further inward progress of the door causes the pin to act upon the toggle, forcing it inward and expanding the spring arms enough to permit the knee to pass the center. It then snaps in further and assumes the position shown by the dotted lines, and the tension of the spring arm extremities toward each other holds the jaws and the inclosed pin, and therefore the door, firmly in this position, which is the position of the tightly closed door. Then an outward pull of the door and striker pin will pull the toggle knee outwardly, and expand the spring arms enough for it to pass the center. The pin will then be released.

[2] According to all definitions, it is characteristic of a toggle that it should comprise two arms with their ends pivoted together, permitting lateral motion at the pivotal point and longitudinal motion at one or both ends of the arms. Its usual office is to translate lateral into longitudinal motion. Its ordinary useful function is to increase the power resulting in a longitudinal direction correlatively to the loss in distance—e. g., inward motion at the joint or knee might continue for three inches until the center was reached, thereby producing a longitudinal extension of (say) only one-half inch at the ends of the arms, but a corresponding gain in power. It is manifest that when the device is built in the form and proportions shown in the drawings, and when it is at work holding the latch shut or open, the springs exert, for this purpose, the least power that they can do at any time,

[1]Claim 1: "A latch having a keeper, said keeper having, in combination, a pair of jaws, a pair of toggle arms carrying said jaws, and means for yieldingly resisting the movement of the toggle arms towards their center of movement."

and the working effect is to get an increase of motion with a loss of power. However, the more characteristic action is found during the first half of each opening or shutting; the specification calls these arms toggle arms, and the joint a toggle joint, and the name may be accepted as appropriate enough.

The defendant uses a device shown by the following sketches; Fig. 1 showing the unlatched and Fig. 2 the latched position. It embodies

Figure 1 Figure 2

a more or less disc-shaped piece stamped out of sheet metal and intended to be pivoted near its center to ears projecting from a base attached to the casing. The upper portion is cut away, so as to form an irregular recess, the lower side of which is produced into an arm. The lower part is extended to one side to form a thumb piece. It is, characteristically, a simple lever extending from the thumb piece to the end of the opposite arm, and carrying on its upper side just above its pivot or fulcrum a hook or jaw. In the edge of the disc, on the side opposite the thumb piece, is a notch or recess, and inserted into this recess is one end of a small bar, the other end of which is held loosely in a guide on the base plate, so that it may have both longitudinal and swinging motion therein. A cylindrical coiled spring surrounds this bar and is held between stops, at one end on the bar and at the other end on the plate. This coiled spring is normally under compression, and, accordingly, the rod has a spring-actuated longitudinal thrust toward the disc. As the striker pin is moved down and comes in contact with the disc arm, it causes the disc to rotate on its pivot, the disc notch swings and thrusts the end of the bar, and this exerts compression on the spring, and the rod yields longitudinally until it passes the dead center or direct line to the disc pivot. It will then snap further into the position shown in Fig. 2.

It is not easy to find in defendant's structure the "pair of toggle arms" called for by the claim. The first impression is that one of these extends from thumb piece to pivot, and the other from the pivot to the lower end of the spring; but this is erroneous, since the fixed pivot is not and cannot be the toggle joint. If a toggle joint exists, it must be at the point of contact between the disc edge and the spring-pressed rod, because this is the only point the lateral motion of which tends to cause longitudinal motion at the ends of its arms; and it thus becomes apparent that the only toggle arm which can be found in the disc is that portion thereof extending in a straight line from the pivot to the notch. If we conceive the adjacent portions of the disc to be cut away, we will have here an arm (indicated by the dotted lines which we have inserted in the two figures) which might be considered a toggle arm exerting its longitudinal end thrust against the

fixed pivot, and therefore transferring the entire longitudinal motion to the other arm which is slidingly attached.

It seems natural to classify the defendant's device with the type of spring-snap catches, of which there are several instances in the record, where a simple lever is pressed by a spring which will throw and hold the lever into either one of its alternate positions, according as the lever passes the center line or line of direct spring pressure in one way or the other; but if the defendant's latch is reconstructed with the mind's eye sufficiently to lay bare the pair of toggle arms and the characteristic toggle joint action which perhaps lurk therein, and it is thus brought within the patented monopoly, it becomes necessary to ascertain whether, from this broad viewpoint, Crampton invented anything.

There are several earlier patents upon latches which disclose a spring-pressed toggle joint yielding laterally against the blow of the striker pin, and then holding the striker pin after the center has been passed, in nearly, if not quite, as great degree as this conception can be found in defendant's device. Of these, it is sufficient to refer to the patent to Conklin, No. 58,914, dated September 8, 1897. He had a plate lever quite similar to defendant's, except that the outer end was developed into a weight instead of into a thumb piece. The toggle arm, merged in the plate and resting at one end on the fixed pivot, is to be found in Conklin in the identical form and position in which it is found in defendant (if, indeed, it is truly present in either). The other supposed toggle arm, in the form of a spring-pressed thrust rod, is essentially the same as in defendant's device, excepting that its lower end is attached nearly underneath the fixed pivot, and the two toggle arms therefore make at their joint practically a right angle, instead of an obtuse angle, as in defendant's form. In Conklin, as in defendant, the blow of the striker pin is not delivered directly upon the toggle joint in a line at right angles to the line connecting the other ends of the toggle arms, as it is in Crampton; but in both Conklin and defendant this necessary thrust at this right angle is brought about indirectly. The contact of the striker pin with one side of the open jaw rotates the disc or plate. This rotation swings the toggle joint in the arc of a circle, and this arc very soon sufficiently approximates the necessary right-angled thrust.

The only difference in this respect, between defendant and Conklin, is that, because Conklin's toggle joint angle is more acute, a little further swing is necessary before the desired sufficiently right-angled thrust is achieved; but this is a matter of slight degree. Neither in the purpose to be accomplished nor in the means employed can we find any substantial distinction between Conklin and defendant, of a character which would allow Conklin (if later) to escape the charge of infringement, if the defendant is guilty. In other words, if the defendant has the "pair of toggle arms" called for by the claim of the patent in suit, so has Conklin; and it necessarily follows that the claim cannot be valid, if its scope is extended far enough to reach the supposititious toggle arms which, with a sufficient liberality of construction, might be found in defendant.

There is abundant room to find in Crampton patentable novelty over Conklin, even after giving to the terms of the claim a very natural and fairly liberal interpretation. There is, therefore, no reason why the Patent Office should have cited Conklin (as it did not), and the lack of such citation and the issue of the patent in the form which the application was originally presented furnish no argument that the claims should be expanded to cover something of the Conklin type. The more natural implication is to the contrary, and is to the effect that the patentee avoided any danger of a citation to Conklin by putting his claim in a form that did not reach so far.

This conclusion as to the absence from defendant's device of the "pair of toggle arms" makes it unnecessary to consider whether the single hook which the defendant uses should be considered the equivalent of the pair of jaws specified in the claim.

What has been said as to claim 1 applies with at least equal force to claim 3 of the same patent. It calls, in addition, for the striker pin, which, in some form, must be understood as impliedly appurtenant to claim 1, and is also more specific in its requirement for two jaws.

[3] Claim 5 of No. 988,313 is given in the margin.[2] The patentable advance, which is thought to be here indicated, over Crampton's former patent, consists in the means for uniting the two toggle arms at the inner ends to constitute the toggle joint. As this feature is the characteristic one of this patent, and the toggle arms are only the field in which the invention works, we may, without any inconsistency with what has been said as to the other patent, accept plaintiff's theory that defendant's device contains these toggle arms, and, for the purposes of this opinion, we do so, leaving the vital question of infringement to be whether the defendant's structure contains "recesses" in the meeting ends of the toggle arms, and "buttons consisting of heads joined by a shank," or the equivalents of these parts.

Plainly, the defendant does not have these in the form specified, and the question is one of equivalency. In the patented device, the two toggle arms, after assembling, are stopped from outward motion in either direction, so that they cannot open far enough to permit the inserted shank to fall out, while the heads or buttons, at each end of the shank, prevent it from coming out endways. On the theory that defendant's device contains the two toggle arms of the patent, it may be said that one of them—the one which is constructively found embodied in the disc between fixed pivot and notch—has a recess in its end; the notch constituting that recess. The other arm, the spring-thrust bar, has no recess, but has a pointed end, which enters the notch, bears therein, and is thereby held from motion in the plane of the disc. To prevent excessive wear upon this bearing, and (perhaps) to prevent the bar from slipping laterally out of the notch, defendant interposes,

---

[2] Claim 5: "A latch consisting of a bolt and a handle attached thereto in combination with levers provided with recesses at their meeting ends, a button consisting of heads joined by a shank, said shank positioned in said recesses, means to yieldingly hold the levers in position to form toggle arms and to resist the movement of said toggle arms into the same plane, and means to limit the outward movement of said toggle arms, one of said levers provided with a finger engageable with said bolt."

between bar and notch, a thin metal plate, bent across at an angle to fit the end of the bar and the notch, and turns down this plate at the sides of this bar end into ears. This is said to be made of a hardened metal, which will not easily wear.

We cannot find, in this form, and within any reasonable latitude of construction, the equivalent of the patented form. The latter was devised to be substituted for the pivot between the two toggle arms in the earlier patent. The office of the shank and the engaging recesses is to hold the two arms in proper relation to each other. It is, in substance, the pivot bolt of the older patent, but in a specific form suitable for easy assembling. Defendant never had any pivot bolt, and had no occasion to use a substitute. The interposed bearing plate has nothing to do with holding the two arms in contact in the plane of the disc, as the bolt does. They are held in position in this plane just the same, whether the interposed plate is present or not. It cannot be considered as the recess in the end of the bar. It faces the wrong way. Notch and plate together constitute only one recess. The advance made by Crampton in respect to pivoting the two arms was, at best, slight, and defendant has not adopted its characteristic feature.

[4] Upon the reissue patent, No. 14,205, infringement is alleged of the five claims which, upon reissue, were added to the original claims, and of which added claims the characteristic feature is the presence of a thumb lever secured to one of the toggle arms and so adjusted with reference to the striker pin that the thumb lever will open the toggle and throw the striker pin out of engagement. Here, also, there is opportunity to give much broader construction to the call for toggle arms than we could do in the first patent, where they constituted the dominant feature, and with such a construction infringement is not denied. Validity is therefore the controlling issue. The court below concluded from the evidence that Young was not the inventor of this thumb lever improvement, but that Crampton was. We agree. Young's failure to claim this invention in his original was not because of inadvertence, but because he did not then consider it his. His claim thereto was first made after defendant had been for months using its present form, and after Young had found that his original patent would not reach it. If his present claim was not belated as matter of law, the delay at least is persuasive on the issue of fact.

[5] As to the design patent No. 48,958, our conclusion is that it is valid. The controversy is one of originality as between the Leonards, on the one side, and Young, on the other. After the patent issued to Young, the Leonards filed an application and went into interference. The Examiner of Interferences awarded priority to them; the interference record was stipulated into the present case in the court below as the record on this subject; the District Judge found in favor of Young; the higher Patent Office tribunals and the Court of Appeals of the District of Columbia reached the same conclusion as the District Judge, but rested this result so largely upon his opinion that we have thought the question should be examined on this appeal in substantially the same light as if the later decisions at Washington had not been made. We have grave doubt, to say the least, whether the

testimony or the applicable rules of presumption justify a finding that Young made the invention before the Leonards gave their instructions. Indeed, most of Young's testimony does not distinguish between this particular invention and his earlier design patent looking in the same direction.

This patent involves a very narrow margin of invention; except that both parties are so thoroughly committed to the theory that it does show invention, that conclusion would be doubtful; but whatever invention there is consists in the relatively small and precise changes in configuration and appearance as compared with Young's earlier patent. We think the most satisfactory conclusion is that this precise invention was not made until about the middle of June. It was actually developed in detail by the superintendent and draftsman in the Crampton factory. Standing over them with general directions and instructions were Crampton and Young. Young was furnishing the capital, was actually engaged in working out improvements on the different articles that were to be made, and had large experience in this general class of manufacture. He had already perfected a design for these shells which was midway between the old form and the ultimate form—the patent in suit. Crampton had just received from the Leonards their description of the shape and form of the shell they wanted made for them; but their statements and descriptions were general, and it is not clear that they reached those details of configuration which alone are involved in the controversy.

Under familiar principles, they would be entitled to the invention which they had generally described, and which mechanics and draftsmen working for them had developed in detail; but, under the facts in this case, the factory superintendent and the draftsman must be considered employés of Young rather than of the Leonards. The Leonards were the customers and vendees of the Crampton factory, giving instructions as to what they wanted made for them under their purchase contract. Young was, in practical effect, the head of the Crampton factory, and he was already engaged in this precise line of development. We cannot say that he was not entitled to the benefit of whatever invention there was in the details as finally matured. Our only hesitation arises from a letter, written at the time by Crampton, giving credit to the Leonards for the "new design." This letter does not bind Young, but, under the circumstances, it is forceful evidence. The explanation consistent with our general conclusion is that Crampton did not know or appreciate the fact that the Leonards' suggestions were merely along the general line on which Young had been working, that he had no idea that any patentable invention had been made, and that he desired to please and flatter the customers upon whom he was relying for a successful business.

[6] Young complains that, instead of the statutory penalty for the infringement of a design patent, he should have been awarded either profits or a reasonable royalty. The statute (section 9476, U. S. C. S. 1916; Act Feb. 4, 1887) contemplates an award of profits in addition to the penalty when "the total profits * * * from the * * * sale * * * of the article or articles to which the design * * *

has been applied" exceed $250; but, in a case like this, the difficulty is to determine what profits have been made by a sale of the article. The patent was upon a sheet metal shell or casing which surrounds the mechanism of the latch, and was attached to the refrigerator as a part of the latch structure, and was sold by defendant (with negligible exceptions) as a part of the refrigerator. The ornamental design of the shell added something to the attractiveness of the unitary article sold; but it is not seriously contended that all the profits from the refrigerator belonged to Young. It would be less fanciful to treat the latch and casing together as a unit; but defendant did not sell them in this form, unless for occasional replacement. Any segregation of the profits due to the use of this particular design of latch casing is obviously impossible. The statute was passed, we think, to provide for cases of this character, and to prevent the otherwise inevitable result of a recovery of merely nominal damages. Nor does the case seem to us appropriate for applying the rule of reasonable royalty. The absence of any other measure of recovery is one of the reasons for resorting to a reasonable royalty, and the considerations supporting that measure of damages apply with much lessened force, if at all, to a design patent of this character.

[7] The statutory penalty is imposed for selling an article to which such design has been applied. The defendant here has sold about 100,-000. There seems to be no way in which the defendant's infringement can be divided into more than one unit, unless each article stands by itself. Even if the record indicated a number of separate sales, or separate orders taken and filled, it would be true in a typical case, though it might not be in this, that there were likely to be as many sales as there were articles; and we think it could not have been the intention of Congress, without more explicit language, to impose this penalty for each article; indeed, the statute refers to profits of more than $250 from the sale of the "article or articles," as though it was immaterial whether singular or plural. The somewhat analogous copyright statute (section 9546, U. S. C. S.) provides for a measure graduated by the number of copies sold, and Congress might have adapted this statute to design patents, if it had intended such a measure. The discussion of that statute in an opinion of this court (Westermann v. Dispatch Co., 233 Fed. 609, 615, 147 C. C. A. 417) and in the opinion of the Supreme Court reversing in part (Westermann v. Dispatch Co., 249 U. S. 100, 39 Sup. Ct. 194, 63 L. Ed. 499), and what is said on the subject in other cases under this statute (Gimbel v. Hogg [C. C. A. 3] 97 Fed. 791, 38 C. C. A. 419; Frank v. Geiger [C. C.] 121 Fed. 126), are consistent with the conclusion that only one penalty should be awarded, unless there is some measuring of the infringing sales by subordinate units not herein shown.

The decree as to the reissued patent is affirmed; the other decree is reversed for modification, and the case is remanded for proceedings in accordance with this opinion. No costs are awarded in this court.